THE STATE *vs.* WILLIAM CONLON.

First Judicial District, Hartford, January Term, 1895. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, JS.

Article first of the Constitution of this State provides: " That the great and essential principles of liberty and free government may be recognized and established, WE DECLARE, That all men when they form a social compact, are equal in rights; and that no man or set of men are entitled to exclusive public emoluments or privileges from the community."

Chapter 121 of the Public Acts of 1893 provides that no person shall engage in any temporary or transient business for the sale of goods, wares and merchandise, without obtaining a license therefor, and that the mayor of any city, the warden of any borough, and the selectmen of any town, may issue a license to such persons as they find proper persons to engage in such business, upon receipt of a fee of not less than one dollar, nor more than one hundred dollars, as the authority issuing such license may require; and that any person violating

such provision shall be liable, upon conviction, to fine or imprisonment, or both.

Upon demurrer to an information charging a violation of chapter 121 as a misdemeanor, it was *held :—*

1. That this Act was purely a trade regulation, relating, not to a business dangerous to the public, but to ordinary and lawful business in which all citizens have an equal right to engage; and its legal effect was to authorize the local officers of each municipality to grant exclusive privileges in the transaction of such lawful business to such persons as they pleased.

2. That the provisions of the Act authorizing subordinate officers, in the exercise of an arbitrary discretion, uncontrolled by law, to grant such special privileges, are obnoxious to the limitations on legislative power contained in article first of the Constitution, and are void.

[Argued January 2d—decided January 24th, 1895.]

PROSECUTION for a violation of the provisions of chapter 121 of the Public Acts of 1893, concerning the sale of merchandise by itinerant peddlers without a license; brought to the Superior Court in Tolland County and tried to the jury before *Prentice, J.;* verdict and judgment of guilty, and appeal by the defendant for alleged errors of the court in overruling his demurrer to the information. *Error and judgment reversed.*

*Charles E. Perkins* and *Jeremiah J. Desmond,* for the appellant (defendant).

I. By the Act in question, no person is allowed to sell any goods, wares, or merchandise of any description, in any city, borough or town, unless the mayor of the city, the warden of the borough or the selectmen of the town shall consider him a proper person, and shall give him a license. These officers are given the absolute power of deciding, without hearing and without appeal, whether any citizen of the State shall be allowed to sell dry goods, boots and shoes, clothes or any other goods within their respective jurisdictions, provided the business is "temporary" and not "permanent"; and they can say, if they please, that no one shall be allowed to do so, or that only one person, whomsoever they see fit, shall have a monopoly of such temporary sales. We submit

that the legislatue has no power to so limit the rights of citizens of this State.

The fourteenth amendment to the Constitution of the United States provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," and our own Constitution provides that no man shall "be deprived of life, liberty or property, but by due course of law." This defendant is a citizen of the United States, and the right to engage in any lawful business either temporarily or permanently is clearly a "privilege," and as clearly is protected by the words, "liberty and property." An essential element in property is the right to sell it, and any law which deprives a person of that right deprives him of property.

In *Bertholf* v. *O'Reilly*, 74 N. Y., 515, the court say: "The right to liberty embraces the right of man to exercise his faculties, and to follow the lawful avocations for the support of life." *People* v. *Marx*, 99 N. Y., 377; Tiedeman on Police Power, 11–196; Cooley on Const. Lim., p. 393, says: "To forbid an individual or a class the right to the acquisition or the enjoyment of property in such manner as should be permitted to the community at large, would be to deprive them of liberty in particulars of primary importance to their pursuit of happiness, and those who should claim a right to do so, ought to be able to show a specific authority therefor, instead of calling upon others to show how and where the authority is negatived."

II. It is evident that this case does not come within the cases of license. The objection here is not that a license is required of every transient seller, but that no one is allowed to sell though he is willing to take a license, unless a certain person or officer sees fit to let him have one. Nor does it come within the rules governing the sale of liquors or gunpowder or other injurious or dangerous substances or trades which are, or may be nuisances. In such cases there is a power to prohibit which includes all lesser limitations, although even then it is doubtful whether the legislature could establish a monopoly. This subject is considered in the

*Slaughter House Cases*, 16 Wall. 36, but it has no relation to the case at bar, because here the sale of any goods or merchandise is covered no matter how harmless.

The principle at the foundation of the police power, is the right and duty of the legislature to protect the public from injury by prohibiting or regulating such occupations as are calculated to injure the public, but this right is not an absolute one. It is limited by the constitution and by the courts. Tiedeman on Police Power, p. 197.

Undoubtedly the legislature may make certain rules and regulations as to transient or temporary sellers of goods. Such is the case of *Com.* v. *Crowell*, 156 Mass., 215. But the Massachusetts statute differed from this, in the essential particular that every one who wished could obtain a license. It did not purport, as this does, to allow one person at his pleasure to prevent any one he pleased from selling temporarily. See also *Borough* v. *Phillips*, 148 Pa. St., 482; *Baltimore* v. *Radecke*, 49 Md., 217; *Yick Wo* v. *Hopkins*, 118 U. S., 356; *Barthel* v. *New Orleans*, 24 *Fed. Rep.*, 563; *Richmond* v. *Dudley*, 129 Ind., 112; *In re Frazee*, 63 Mich., 396; *Anderson* v. *City*, 40 Kan., 173; *Chicago* v. *Trotter*, 136 Ill., 430; *State* v. *Mahner*, 43 La. An., 496.

It will be noticed that although many of these decisions were cases of ordinances, and not Acts of the legislature, the principles upon which they are decided are general and constitutional, and apply to legislative Acts as well as to ordinances. *State* v. *Dubarry*, 44 La. An., 1117; *Rich* v. *Napierville*, 42 Ill. App., 222; *Ex parte Sing Lee*, 96 Cal., 354, and Central Law Journal, No. 1, Vol. 36, page 4; *State Center* v. *Barenstein*, 66 Iowa, 249; *Hannibal* v. *Price*, 29 Mo. App., 280. We know of no case in this State having much bearing on the state of facts here. In *Blydenburg* v. *Miles*, 39 Conn., 484, no question like those at bar arose. The construction of this law has been lately before this court in a case from New Haven County (*State* v. *Fetterer*), but it was on an entirely different point. The specific objection to this Act is, that it does not attempt to prohibit the business mentioned altogether, nor does it attempt to regulate or control

it by rules and regulations applicable to all persons, but it places every citizen desiring to carry on this kind of business under the absolute power of a single individual who can decide whether or not he can carry on business at all. The mere statement of such a claim of power would seem to be sufficient to show its illegality.

*Joel H. Reed*, State's Attorney, for the appellee (the State).

·I. This statute is not contrary to any of the provisions of the Constitution of the United States, or of the State of Connecticut. It is a proper exercise of the police power of the State. Cooley on Taxation, 412, 413 ; *Com.* v. *Smith*, 6 Bush, 303 ; *Mork* v. *Com.*, id. 397 ; Cooley on Const. Lim., 742–746.

II. As to this statute being void as against natural justice, and unreasonable, and in restraint of trade, it is respectfully submitted, notwithstanding there are some cases in our own reports, and those of other States in which the judges have intimated a different doctrine, that where the legislative meaning is plain and not open to construction, as is the case with this statute, and the powers therein exercised are not restricted by the terms of either State or National Constitution, that it is not competent for the courts to declare the statute void for the reasons named. They cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power. Cooley on Const. Lim., 197–201 ; *Bishop's Fund* v. *Rider*, 13 Conn., 103 ; *State* v. *Wheeler*, 25 id., 290 ; *White* v. *Stamford*, 37 id., 578 ; *Goshen* v. *Stoning ton*, 4 id., 209 ; *Bridgeport* v. *Housatonic R. R. Co.*, 15 id., 496 ; *Welch* v. *Wadsworth*, 30 id., 149 ; *Booth* v. *Woodbury*, 32 id., 118 ; *Welch* v. *Hotchkiss*, 39 id., 140 ; *Camp* v. *Rogers*, 44 id., 291 ; *Wheeler's Appeal*, 45 id., 306. These cases from our own reports are cited to show that while in some of them the powers contended for seem to be incidentally recognized, in others they are distinctly repudiated, and in none of them are they directly invoked to avoid a statute.

But the statute is open to none of the objections claimed. And if the court has the power to declare it void it will not

do so except in very clear cases. *White* v. *Stamford*, 37 Conn., 587 ; *Lathrop* v. *Stedman*, 42 id., 588.

HAMERSLEY, J. "An Act concerning Sales of Merchandise by Itinerant Peddlers" contains the following provisions :—

"Section 1. The mayor of any city, the warden of any borough, and the selectmen of any town, may issue a license to such persons as they find proper persons to engage in a temporary or transient business, in one locality, either in a building, tent, or other premises, for the sale of goods, wares and merchandise, * * * in their respective cities, boroughs, or towns, for a term not exceeding one year, upon the applicant paying to such municipal corporation a fee not less than one dollar nor more than one hundred dollars, as the authority issuing such license may direct; * * *

"Sec. 2. Any person engaging in any business mentioned in section one of this Act, except in the sale of articles that are the product of a farm or of the sea, without obtaining a license therefor, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than seven dollars nor more than two hundred dollars, or imprisoned not less than thirty days nor more than six months, or both." Public Acts of 1893, p. 271.

The State's Attorney for Tolland county filed an information charging the defendant with a misdemeanor under this Act in the sale of boots and shoes at a store in the city of Rockville. The defendant demurred to the information because the statute is void as being contrary to the provisions of the Constitution of Connecticut, and of the Constitution of the United States, and to the principles of natural justice. The demurrer was overruled ; and the defendant was tried, convicted and sentenced. This is an appeal from the judgment of conviction ; and the only error assigned by the defendant is the action of the Superior Court in overruling the demurrer.

The legislature has power to require a license for the transaction of any business, either for the purpose of raising

a revenue, or for the purpose of regulating the conduct of such business, as public interests may demand. This power, however, is, in the manner of its exercise, subject to the limitations embodied in the Constitution, including in that term the Constitution of the United States as well as that of Connecticut ; the former, so far as it relates to such question, is in reality a part of the latter, and must be so regarded by this court in determining the validity of any legislative Act. The question whether or not a particular law is obnoxious to any such limitation does not depend upon the wisdom of the law. We therefore dismiss as immaterial all considerations urged in argument as to the propriety of this legislation; and consider only the legal effect of the Act, and the power of the legislature to enact such a law.

*First :* What is the legal effect of the Act ? The validity of the law in this case depends upon its real legal effect, and not merely upon its phraseology. In determining whether any law invades a right secured by constitutional enactment the court looks at the essence as well as the form. *In re Application of Clark,* 65 Conn., 17.

The Act is not an exercise of the power of taxation. This is too plain for argument. It is purely a trade regulation; and the crime of which the defendant was convicted consists solely in the violation of such regulation. The power, first, to regulate the conduct of all business, or of any particular business, harmless in its nature and which every citizen has the right to carry on ; and second, to regulate, even to the extent of prohibition, any business in its nature injurious to the public,—is vested in the legislature in the broadest terms ; but the exercise of that power in the two cases is governed by different principles. In the latter case the controlling object is giving to the public that protection from danger which the State is bound to give, and ordinarily the legislature must be the judge of the degree of danger and of the required protection. It may restrict the business by requiring large license fees, or by other protective regulations; and it may restrict the conduct of the business to a limited number of persons, or to persons possessing certain quali-

fications, to be determined by public officers to whom the administration of the law is given—or, in certain cases, to such persons as these public officers may select—thus treating the persons intrusted with the business as *quasi* public officers, and authorizing their selection on grounds of special fitness, similar to those applicable to the appointment of any State officer or agent. The illustrations of such regulations of a business dangerous to the public are familiar, and the cases maintaining the power of the legislature to establish them are too numerous to cite.

But the law in question is not a regulation of a business dangerous to the public, and does not come within the special principles applicable to such regulations. It relates to all business "for the sale of goods, wares and merchandise," to the bread and meat essential to the support of life, and to every commodity a human being has need of; the only distinction made by the law is that between a business that is temporary and transient and all other business. It does not define a "temporary or transient" business. Such phrase has no technical legal meaning. The natural meaning of the words as generally understood does not furnish a definite guide to what the statute permits and what it prohibits. Its validity might perhaps be questioned on the ground that the language used is too vague to constitute and define a crime, but that question was not discussed in argument. The defendant is punished for selling boots and shoes in the conduct of a temporary and transient business. There is nothing in the nature of such business more dangerous to the public when called temporary, than if called permanent. There is no distinction as to public danger between a boot and shoe business conducted by a man for an indefinite time, and the same business conducted after his death by his executor in the settlement of his estate, for a short and definite time. The statute does not relate to any temporary business involving dangers peculiar to itself; it draws no line of distinction except between a business that is temporary and one that is not temporary. One is no more dangerous to the public than the other; one is no more essential to the con-

duct of human affairs than the other; indeed it would be impracticable to carry on the necessary transactions of life without " temporary and transient business for the sale of goods, wares and merchandise." It may be that future conditions will produce a general conviction that any temporary business is as dangerous to public morals and good order as lotteries, disorderly houses, tippling shops, or those suspicious vagrants who more than two hundred years ago were called " peddlers and petty chapmen," and whose business was absolutely prohibited. 3 Colonial Records, 435. It is unnecessary to consider how far the legislature may anticipate common experience, in declaring a business generally regarded as harmless and lawful to be dangerous to public morals and order; it is enough that the legislature has made no such declaration as to the business under discussion. The Act, therefore, must be held to deal with temporary or transient business for the purpose of regulating an ordinary and lawful business essential to the conduct of human affairs, in which all citizens have an equal right to engage.

The legislature has full power to regulate such a business, but its regulations must be governed by very different principles from those which may govern the regulations of a business in its nature dangerous to the public. In the one business no citizen has an absolute right to engage; in the other all citizens have the right and an equal right to engage. The difference is vital.

What is the regulation prescribed by this Act? It is simply a prohibition of the business unless a license is obtained from the officers of the municipality where the business is to be conducted. If the terms on which such license should be granted were defined, a different question would be presented. If the legislature believes that fraud and deception are increasingly liable to be practiced in the conduct of any kind of business, or of all business, it may undoubtedly require, by way of security against such fraud and deception, the persons engaging in such business to take out licenses on terms prescribed by law and applying equally to all citizens. In Massachusetts " An Act to prevent and punish

State v. Conlon.

fraud in sales of goods, wares and merchandise at public or private sale by itinerant vendors and to regulate such sales" was recently passed. The Act attempted to define "itinerant vendors" so as to include ordinary transient business, provided security for their customers by requiring a deposit of money to be made with the State, and by other regulations, and required the amount of the license fee charged to be ascertained according to law, and a license to be issued to whoever complied with the law. This Act was held not to violate the Massachusetts Constitution by a majority of the Supreme Court. *Commonwealth* v. *Crowell,* 156 Mass., 215. However such an act might be regarded under our Constitution, it is wholly different from the Act under discussion, which not only forbids the transaction of the business without a license, but permits the local authority to grant a license to one and to refuse it to another, in pursuance of a discretion unguided and unrestrained by law. It says: "The mayor may license such persons as he finds to be proper persons to engage in a temporary business for the sale of goods, wares and merchandise," and "any person engaging in such business without obtaining a license therefor shall be guilty of a misdemeanor." The unrestrained power of selecting the favored recipients of a license is given to the mayor; all persons who cannot obtain this special privilege are forbidden to carry on the business under a penalty that may extend to a fine of $200 and imprisonment in the common jail for six months. If the word "may" as here used could be given the effect of "shall," the question would be presented in a little different form. It would be our duty to construe "may" as "shall," if necessary to give effect to an Act, and the context would permit such construction. But here the context plainly forbids that construction. The conditions of the Act do not support a mandate to issue a license upon compliance with rules established by law; on the contrary, they clearly provide for the exercise of a discretion unrestrained by law. The phrase "such persons as he finds proper persons to engage in a temporary business," is too vague to support any definite judicial or *quasi* judicial action.

There is not a regulation established which the licensees are bound by law to observe, and there is absolutely no legal test and no indication of who may be a "proper person." Without some test fixed by law every person must be presumed to be a proper person to conduct an ordinary and lawful business. The mayor is authorized to select from those legally presumed to be proper persons such as he finds proper; the necessary legal effect of this phrase is "such persons as he pleases." So that if "may" were construed as "shall," the Act would then say, "the mayor shall license such persons as he pleases."

Again, the provision giving the mayor absolute power to fix the license fee at one dollar for one year, or one hundred dollars for one day, i. e., to fix the license fee so that it shall be, at his pleasure, either nominal or prohibitive, in connection with the other provisions, renders it certain that the purpose of the statute, as well as its legal effect, is to authorize the mayor to permit or forbid the transaction of an ordinary lawful business at his pleasure. This purpose of the Act to secure to favored persons special privileges in the conduct of a lawful business open of right to all citizens, is further indicated by the provision that exempts from the operation of the Act "articles that are the product of a farm or of the sea."

We can find no escape from the conclusion that the legal effect of the Act is to authorize the local officers of each municipality to grant exclusive privileges to such persons as they please in the transaction of a lawful business essential to the conduct of human affairs, and in which each citizen has an equal right to engage for the support of life.

Second: Has the legislature power to enact such a law? The Constitution of Connecticut is somewhat peculiar in its limitation of legislative power. The "legislative power of this State" is, in the broadest terms vested in the "General Assembly." This power is, in a certain way, defined and limited by the provisions dividing the powers of government into distinct departments, and by those relating to the operation of the State government and duties of particular officers.

But, unlike the constitutions of many States, it contains no specific limitations on the exercise of legislative power, except some slight restrictions in one or two recent amendments. The limitations, however, are no less real, and perhaps more effective, than if phrased in specific terms.

Our Bill of Rights constitutes the fundamental condition on which all powers of government can be exercised. Its more definite declarations are chiefly concerned with the administration of justice, especially of the criminal law, the preservation of the trial by jury, the protection of private property from confiscation for public use, the right of the citizen to bear arms and the subordination of the military to the civil power; but the protection of the citizen in the equal enjoyment of those essential rights belonging to citizens of a free government is guaranteed, not in narrow phrases of detailed statement, but in terms as broad as those which vest the legislative power in the General Assembly, or the judicial power in the courts.

The Bill of Rights begins as follows: " That the great and essential principles of liberty and free government may be recognized and established, WE DECLARE, That all men when they form a social compact, are equal in rights; and that no man or set of men are entitled to exclusive public emoluments or privileges from the community." No legislative Act is law, that clearly and certainly is obnoxious to the principle of equality in rights thus solemnly made the condition of all exercise of legislative power. It is patent that not everything that can be called a right is included in this guaranty. The protected rights are those that inhere in " the great and essential principles of liberty and free government" recognized in the course of events that resulted in our independence, and established by the adoption of our Constitution. The language used is purposely broad, as the language in reference to the absolute power of legislation is broad; and the relation of limitation to power can, in the nature of things, be settled only through specific applications as emergencies arise. Among the principles thus established were those universally accepted as so essential

to free government as to justify the resort to armed rebellion in our war of independence; and of these, equality under the law, in the rights to "life, liberty, and the pursuit of happiness," was clearly recognized. ·

Upon the first establishment of government in Connecticut, reliance for the security of civil rights and liberties was placed on the fact that the legislature, in which was concentrated all powers of government, depended on the free and annual election of the people; but as early as 1650 the free enjoyment of certain "liberties, immunities and privileges" was recognized as essential to the stability of Commonwealths, and the denial thereof as threatening their ruin. The enjoyment of such rights, however, was then recognized as due only to "every man in his place and proportion." Code of 1650, p. 1. The full recognition of the principle of equality in rights, as well as of the necessity of protection by a fundamental law, was of later growth. In 1672 the right of every man to "enjoy the same justice and law within this Colony" was recognized. Revision of 1672. These principles were embodied in a statutory declaration of rights, which remained substantially unchanged until the adoption of our Constitution. During the period preceding and following the Revolution, the conviction became general that equality under the law in the enjoyment of certain rights was so essential to free government, that it must be defended against invasion even from the law-making power. In a proclamation issued June 18th, 1776, Governor Jonathan Trumbull expressed the conviction of the Colony of Connecticut, in maintaining that the people "form themselves into Society, and to set up and establish civil Government for the Protection and Security of their Lives and Properties" from invasion by those "appointed by the People the Guardians of their Lives and Liberties," and that the course of the King of Great Britain in "depriving us of our natural, lawful, and most important Rights, and subjecting us to the absolute Power and Controul of himself, and the *British* Legislature," justified a rebellion. 15 Colonial Records, 450. And the declaration by Congress, that equality under the

law in the right to life, liberty and the pursuit of happiness, is a self-evident truth, was formally approved by this State November 7th, 1776 (1 Records State of Connecticut, pp. 3, 243); and in August, 1777, was ordered to be recorded at length in the State Records "that the memory thereof may be preserved to posterity." 1 Records State of Connecticut, 367. It was an express purpose of our Constitution "effectually to define, secure and perpetuate the liberties, rights and privileges" derived from our ancestors; and we deem it clear that our Bill of Rights includes this principle of equality among those principles essential to liberty and free government, to establish which it declares that all members of our political society are equal in rights; and that "no man or set of men are entitled to exclusive public emoluments or privileges from the community." Our legislation affecting any important interest has been so generally confined within the clear lines of legislative power, that there has been no occasion to apply the limitations of the first section of the Bill of Rights. The nearest approach to a judicial determination on this subject is in *Norwich Gas Light Co.* v. *Norwich City Gas Co.*, 25 Conn., 38, where the court holds that if the law then under consideration can be fairly viewed as intended to operate as a discriminating restriction upon carrying on an ordinary business in respect to which the government has no exclusive prerogative, it comes directly within the definition of a monopoly and may be obnoxious to the first section of our Bill of Rights. The application of the Bill of Rights, approved in that case, is plainly necessary to the decision of this; we entertain no doubt of its correctness, and feel bound to hold distinctly that an Act of the legislature, the only legal effect of which is to grant exclusive privileges in the conduct of an ordinary lawful business, in respect to which the government has no exclusive prerogative, is obnoxious to the first section of the Bill of Rights and void. There is, in respect to its validity, no distinction between such a law and one authorizing such privileges to be granted by subordinate officers in the exercise of a mere arbitrary discretion wholly uncontrolled by law.

The Act upon which the information against the defend-ant is based, so far as its provisions relate to the right to engage in any lawful "temporary or transient" business, cannot operate so as to make engaging in such business a misdemeanor, and therefore the information does not show any legal offense.

It is unnecessary to consider the other grounds on which the defendant demurred to the information.

There is error in the judgment of the Superior Court and it is reversed.

In this opinion the other judges concurred.